**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
EASTERN DIVISION**

| | | |
|---|---|---|
| SOUTHERN CONCRETE PRODUCTS, INC., | | |
| Plaintiff, | | |
| v. | | Case No. 1:19-cv-01105-STA-jay |
| LIBERTY HOLDINGS, L.P., HILLTOP CONCRETE, LLC, J & S INVESTMENTS, RSTM PACIFIC, LLC, SCOTT J. WEISS, AND CHRISTOPHER J. MILLER, | | |
| Defendants. | | |

## ORDER PARTIALLY GRANTING AND PARTIALLY DENYING MOTION TO DISMISS SECOND AMENDED COMPLAINT

Plaintiff Southern Concrete Products, Inc., filed a complaint on sworn account in the Circuit Court of Madison County, Tennessee, against Liberty Holdings, L.P., to recover $108,021.84 on an unpaid account.  Subsequently, Southern Concrete filed an amended complaint adding J & S Investments, RSTM Pacific, LLC, Hilltop Concrete, LLC, Scott Weiss, and Christopher Miller as defendants.  Plaintiff alleges theories of fraudulent transfer and civil conspiracy.  Defendants removed the action to this Court pursuant to 28 U.S.C. § 1332, diversity of citizenship (ECF No. 1), and filed a motion to dismiss for lack of personal jurisdiction or, in the alternative, for failure to state a claim for relief pursuant to Rule 12(b)(2) and 12(b)(6) of the Federal Civil Rules of Procedure.  (ECF No. 9.)[1] The Court, *inter alia*, denied relief subject to

---

[1]  Liberty Holdings has not made an appearance in this action and, therefore, was not a party to the first motion to dismiss (ECF No. 9) and is not a party to the present motion to dismiss.  (ECF No. 64.) Defendants do not dispute that personal jurisdiction is appropriate as to Liberty Holdings.

1

revisiting the issue of personal jurisdiction after allowing Southern Concrete to take jurisdictional discovery. (ECF No. 15.)

After several extensions of time, the jurisdictional discovery period closed on June 30, 2020, and Defendants' deadline to renew their Rule 12(b)(2) motion was set for July 15, 2020. Prior to that date, Southern Concrete filed a second amended complaint, adding eleven new defendants who were alleged alter egos of or co-conspirators with Liberty Holdings and expanding its request for damages by adding a debt of over $300,000 allegedly due for goods that Southern Concrete sold to proposed new defendant Artisan Precast. (ECF No. 34.) Various additional allegations purported to clarify present Defendants' role in incurring the alleged debts.

The Court struck the second amended complaint because Southern Concrete had not complied with Federal Rules of Civil Procedure 15(a) in seeking permission before filing its second amended complaint. (ECF No. 53.) Southern Concrete then filed a motion for leave to file a second amended complaint (ECF No. 54), which the Court granted in part and denied in part. (ECF No. 60.) The motion was granted to the extent that Southern Concrete sought to add or clarify factual allegations concerning the defendants named in the first amended complaint as to the contacts those defendants had with the forum state of Tennessee. The motion was denied to the extent that Southern Concrete sought to add new defendants and recover the debt purportedly incurred by Artisan Precast. Southern Concrete filed its second amended complaint on January 27, 2021. (ECF No. 61.)

Defendants have now filed a renewed Fed. R. Civ. P. 12(b)(2) motion to dismiss for lack of personal jurisdiction. (ECF No. 64.) Plaintiff has filed a response (ECF No. 65), and Defendants have filed a reply to the response. (ECF No. 67.) For the reasons set forth below, Defendants' motion is **PARTIALLY GRANTED** and **PARTIALLY DENIED**.

Standard of Review and Statement of Law

In the order denying Defendants' first motion to dismiss (ECF No. 15), the Court set out the standard of review for motions filed under Fed. R. Civ. P. 12(b)(2) for lack of personal jurisdiction which the Court now reiterates.  A plaintiff bears the burden of establishing that personal jurisdiction exists over the defendants., *McNutt v. General Motors Acceptance Corp.*, 98 U.S. 178, 189 (1936); *see also Neogen Corp. v. Neo Gen Screening, Inc.*, 282 F.3d 883, 887 (6th Cir. 2002) ("As the plaintiff, Neogen has the burden of establishing the district court's personal jurisdiction over [the defendant].") This can be accomplished by alleging, with reasonable particularity, facts that demonstrate sufficient contacts between each defendant and the forum state to justify the Court's exercise of personal jurisdiction over the defendant. *See*, *e.g.*, *Healthcare Capital, LLC v. HealthMed, Inc.*, 213 F. Supp. 2d 850, 855 (S.D. Ohio 2002) (citing *Neogen Corp.*) When a properly supported motion to dismiss is filed, the plaintiff may not stand on its pleadings but must, by affidavit or otherwise, set forth specific facts showing that the Court has jurisdiction. *Weller v. Cromwell Oil Co.*, 504 F.2d 927, 929 (6th Cir.1974).  If the Court relies solely on affidavits, the plaintiff need only make a *prima facie* showing that personal jurisdiction exists.  *See Theunissen v. Matthews*, 935 F.2d 1454, 1458 (6th Cir. 1991).  However, when the Court permits discovery, as in the present case, the plaintiff must establish that jurisdiction exists by a preponderance of the evidence. *See Serras v. First Tennessee Bank Nat. Ass'n.*, 875 F.2d 1212, 1214 (6th Cir. 1989); *see also Williams v. FirstPlus Home Loan Tr. 1996-2*, 209 F.R.D. 404, 409 (W.D. Tenn. 2002) ("To defeat a motion to dismiss for lack of personal jurisdiction, a plaintiff . . . may not rely on his pleadings; he must, by affidavit or otherwise, set forth specific facts establishing that the court has jurisdiction.")

The Court must apply the law of the state in which it sits, subject to due process limitations,

to determine whether personal jurisdiction exists over a nonresident defendant in a diversity action. *See Welsh v. Gibbs*, 631 F.2d 436, 439 (6th Cir. 1980).  Tennessee's long-arm statute provides that nonresidents of Tennessee are subject to personal jurisdiction on "[a]ny basis not inconsistent with the constitution of this state or of the United States."[2]  Tenn. Code Ann. § 20-2-214(6).  Tennessee courts have construed this statute to allow the exercise of personal jurisdiction "to the full limit allowed by due process." *Third Nat'l Bank v. WEDGE Group Inc.*, 882 F.2d 1087, 1089 (6th Cir. 1989) (quoting *Masada Inv. Corp. v. Allen*, 697 S.W.2d 332, 334 (Tenn. 1985)).

In *Int'l Shoe Co. v. Washington*, 326 U.S. 310 (1945), the United States Supreme Court held that an exercise of personal jurisdiction over a nonresident defendant satisfies constitutional due process if the defendant has "certain minimum contacts with [the state] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Id.* at 316 (internal quotations omitted). Under the "minimum contacts" test there are two types of personal jurisdiction: (1) "general" or "all-purpose" jurisdiction and (2) "specific" or "case-linked"

---

[2]  Specific acts which may subject a nonresident to the jurisdiction of the courts of Tennessee are:

1) The transaction of any business within this state;

(2) Any tortious act or omission within this state;

(3) The ownership or possession of any interest in property located within this state;

(4) Entering into any contract of insurance, indemnity or guaranty covering any person, property or risk located within this state at the time of contracting;

(5) Entering into a contract for services to be rendered or for materials to be furnished in this state ….

Tenn. Code Ann. § 20-2-214.  Ultimately, the Court must only determine whether the exercise of personal jurisdiction satisfies due process. *See Aristech Chem. Int'l v. Acrylic Fabricators*, 138 F.3d 624, 627 (6th Cir. 1998) ("[W]hen a state's long-arm statute reaches as far as the limits of the Due Process Clause, the two inquiries merge and the court 'need only determine whether the assertion of personal jurisdiction ... violates constitutional due process.'").

4

jurisdiction. *First Cmty. Bank, N.A. v. First Tenn. Bank*, 489 S.W.3d 369, 384–85 (Tenn. 2015) (citing *Int'l Shoe Co.*, 326 U.S. at 317–18).  General jurisdiction is not at issue in the present case as to the movant Defendants because none of the entity/corporate defendants was organized in this state, none has an office in this state, none is doing business in Tennessee or paying taxes here, none owns property or maintains bank accounts in this state, and none of them have customers in this state. (Miller Decl., ¶¶ 7, 12; Weiss Decl., ¶¶ 6, 10, 24, ECF No. 64.)

Therefore, in order to defeat the motion to dismiss, Plaintiff must establish specific jurisdiction over the movant Defendants. In looking at the issue of specific jurisdiction, due process requires that a defendant "have certain minimum contacts" with the forum state. *International Shoe Co.*, 326 U.S. at 316 (quoting *Milliken v. Meyer*, 311 U.S. 457, 463 (1940)). To determine whether a defendant has the requisite minimum contacts, the Court employs the following three-part test:

> First, the defendant must purposefully avail himself of the privilege of acting in the forum state or causing a consequence in the forum state.  Second, the cause of action must arise from the defendant's activities there.  Finally, the acts of the defendant or consequences caused by the defendant must have a substantial enough connection with the forum state to make the exercise of jurisdiction over the defendant reasonable.

*Southern Mach. Co. v. Mohasco Indus., Inc.*, 401 F.2d 374, 381 (6th Cir. 1968).

The Court then looks at the due process requirement that out-of-state defendants have "fair warning" that they could be "haled into" court in a foreign jurisdiction.  *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472-74 (1985). This requirement "is satisfied if the defendant has 'purposefully directed' his activities at residents of the forum.... and the litigation results from alleged injuries that 'arise out of or relate to' those activities."  *Id.* at 472 (citations omitted).  The due process clause forecloses personal jurisdiction unless the actions of the "defendant himself ... create[d] a 'substantial connection' with the forum State." *Id.* at 475 (citations omitted). *See also*

*Asahi Metal Indus. Co. v. Superior Ct. of Cal.*, 480 U.S. 102, 112 (1987) (stating that the action of a defendant must be purposefully directed toward the forum state). Once the Court has found that the defendant purposefully established the requisite minimum contacts with the forum state, the Court still must determine whether the assertion of jurisdiction comports with "fair play and substantial justice." *Burger King*, 471 U.S. at 476 (quoting *International Shoe*, 326 U.S. at 320).

In looking at specific jurisdiction, the Supreme Court in *Ford Motor Co. v. Mont. Eighth Judicial Dist. Court*, 141 S. Ct. 1017 (2021), recently explained as follows.

> It [specific jurisdiction] covers defendants less intimately connected with a State, but only as to a narrower class of claims. The contacts needed for this kind of jurisdiction often go by the name "purposeful availment." The defendant, we have said, must take some act by which it purposefully avails itself of the privilege of conducting activities within the forum State. The contacts must be the defendant's own choice and not random, isolated, or fortuitous. They must show that the defendant deliberately reached out beyond its home — by, for example, exploiting a market in the forum State or entering a contractual relationship centered there. Yet even then — because the defendant is not "at home" — the forum State may exercise jurisdiction in only certain cases. The plaintiff's claims, we have often stated, must arise out of or relate to the defendant's contacts with the forum. Or put just a bit differently, there must be an affiliation between the forum and the underlying controversy, principally, an activity or an occurrence that takes place in the forum State and is therefore subject to the State's regulation.

141 S. Ct. at 1024–1025 (punctuation modified, citations omitted).

The Supreme Court found that Ford had purposefully availed itself of the privilege of engaging in activities in Minnesota and Montana by advertising its cars for sale, having its dealers maintain and repair Ford cars, distributing replacement parts, and generally encouraging "Montanans and Minnesotans to become lifelong Ford drivers." *Id.* at 1028. Because Ford systematically served a market in the states for the vehicles that allegedly malfunctioned, the Supreme Court found that there was "a strong relationship among the defendant, the forum, and the litigation — the essential foundation of specific jurisdiction." *Id.* at 1028 (punctuation modified, citation omitted). Regardless of any refinement that the *Ford* Court made to previous

personal jurisdiction jurisprudence, in its decision, the Supreme Court reiterated that the defendant's contacts with the forum state "must show that the defendant deliberately reached out beyond its home." 141 S. Ct. at 1025 (internal quotation omitted).

In their motion, Defendants maintain that Plaintiff has failed to establish any part of the three-part *Mohasco* test.   They also object under Rules 602 and 701 of the Federal Rules of Evidence to portions of the declaration of Cole Dodds (ECF No. 65-1) that Plaintiff has submitted in support of its response to Defendants' motion. (Reply p. 2 n. 1, ECF No. 67.)[3]  The Court will address these objections as they arise in the following background narrative.[4]

<u>Background</u>

Between 2008 and 2012, Southern Concrete manufactured pre-cast concrete barriers and fencing for Artisan Precast, LLC, a now-defunct company and the previous employer of Christopher Miller.  (Dodds Decl. ¶ 6.)[5]  Dodds managed the relationship between Southern Concrete and Artisan Precast, and Miller was his primary contact. (*Id.*)

In 2011, Artisan Precast became insolvent and closed its business, leaving an unpaid debt to Southern Concrete in the amount of approximately $375,000.00 for pre-cast concrete fencing and barriers.  (*Id.* at ¶ 8.)  In late 2011 or early 2012, Scott Weiss formed Liberty Holdings, LLC, to carry on the pre-cast concrete fencing business of Artisan Precast, and he continued the manufacturing/supplier relationship with Southern Concrete. (*Id.* at ¶ 9.)[6]

---

[3]  Dodds is Southern Concrete's general manger.

[4]  The facts are stated for the purpose of deciding this motion only.

[5]  Although Defendants state that they object to this paragraph, it merely provides background for the events giving rise to this action, and the Court will allow it.

[6]  Defendants have objected to paragraph nine of Dodds' Declaration.  The Court has considered only those portions of the paragraph which provide background information.

By 2012 Defendant Christopher Miller was employed by Liberty Holdings.  (Miller Decl. ¶ 6, ECF No. 64-2.)  Liberty Holdings was a mid-size supplier of concrete barrier walls for public and private constructions products. Liberty Holdings served approximately twenty customers over fifteen states, including Tennessee. Liberty Holdings operated out of Tyler, Texas, and Liberty Holdings' customers were primarily located in Texas. In 2012, Liberty Holdings created a website in which it stated it was doing business as "Artisan Precast" and listed a business location in Jackson, Tennessee. (Dodds Decl. ¶ 10).  Liberty Holdings became a paying member of the Jackson Area Chamber of Commerce and maintained its membership between October 24, 2011, and January 30, 2013. (Russell Cook Decl. ¶¶ 5-11, ECF No. 65-2).[7]

Liberty Holdings d/b/a Artisan Precast completed a business account application to do business with Southern Concrete. (Exb. B Sec. Amd. Cmplt., ECF No. 61-2.) The application is dated March 12, 2012. Miller signed the business account application on behalf of Liberty Holdings, LLC, and further signed a personal guarantee of Liberty Holdings, LLC's indebtedness to Southern Concrete which is contained on the application. (*Id.*)  Specifically, Liberty Holdings and Miller agreed to the following material terms contained in the business account application:

> Our credit terms are net 30 days. All purchases bought during the month are due in full by the 10th of the following month. Any account past due may be placed on C O D status until the account is paid in full. A 1.5% finance charge will be added to all past due balances. All past due accounts are responsible for attorney's fees and collection costs. **The undersigned agrees to jurisdiction and venue being in the courts of Madison County, Tennessee.**

(*Id.* (emphasis added)).  Miller, individually, agreed to the additional terms as a personal guarantor of the obligations of Liberty Holdings, LLC:

---

[7]  Miller acknowledges that Liberty Holdings held a membership with the Jackson Chamber of Commerce.  He maintains that Dodds offered to pay the membership fee as part of a Chamber of Commerce membership drive.  (Miller Decl. ¶ 14.)

> Personal Guarantee: In the event that the account is not paid on time, I/We agree to pay all amounts owed to Southern Concrete Products, Inc., including but not limited to all collection costs, finance charges, and attorney fees to collect on the above account.

(*Id.*)[8]

Miller's responsibilities as an officer and employee of Liberty Holdings included sales and marketing to Liberty Holdings' customers, negotiating customer contracts, and overseeing Liberty Holdings' day to day operations, including placing purchase orders for concrete barrier walls with Southern Concrete. (Miller Decl. at ¶ 8.)

Miller was physically present in the state of Tennessee on a few occasions.[9] In or about 2013 or 2014, he travelled to Tennessee to conduct a good will visit to Southern Concrete's manufacturing facility in Jackson, Tennessee, and to discuss Liberty Holdings' specifications for certain concrete barriers that Southern Concrete would produce and sell to Liberty Holdings. (*Id.* at ¶ 9.)

Between 2012 when Liberty Holdings began its business and September 2016, Southern Concrete supplied, manufactured, and produced pre-cast concrete fencing for Liberty Holdings; during this time period, the pre-cast concrete fencing and barriers sold by Liberty Holdings were shipped to Liberty Holdings' customers and contractors from Jackson, Tennessee. (Dodds Decl. at ¶¶ 11, 12.) Miller and other employees of Liberty Holdings placed numerous orders for concrete barrier walls and related products primarily by phone or email to Southern Concrete's agents who

---

[8] In their reply, Defendants contend that the business account application is unauthenticated. However, Miller was presented with the application during his deposition and acknowledged his signature in both places on the application.  He also stated that the application was "executed around the same time that Liberty Holdings started its business."  (Miller Depo. p. 34, ECF No. 65-3.)

[9]  Miller contends that he came to Jackson "a couple" of times, while Dodds says he came three times.  Whether Miller came to Jackson two or three times is not material to the resolution of this motion.

were in Tennessee. Included within Miller's responsibilities was arranging to have checks issued on Liberty Holdings' California bank account to pay vendors, like Southern Concrete.  (Miller Decl. at ¶ 10.)

To ship products from Southern Concrete to Liberty Holdings' customers, Liberty Holdings would contract with a broker. The broker would hire carriers (trucks) to pick up completed concrete fencing from Southern Concrete in Tennessee and deliver to Liberty Holdings' customers in various places across the United States. Generally, the broker would hire the carriers. For example, Stanfill Trucking, a carrier located in Tennessee, picked up fencing from Southern Concrete to deliver to a Tennessee customer, Custom Fence. Liberty Holdings' work for Custom Fence totaled more than $100,000, and the work occurred in or about 2013.  (*Id.* at ¶ 16.)

Southern Concrete produced and sold a total of $1,902,514.85 in finished pre-cast concrete fencing and barrier posts, panels, and panel caps to Liberty Holdings; these products were cast by Southern Concrete from Liberty Holdings' 187 molds that were present at Southern Concrete's Tennessee facility. The concrete fencing and barriers produced by Southern Concrete generated an estimated $8 million to $9 million in retail sales for Liberty Holdings during this time period. (Dodds Decl. at ¶ 16.) During this time, Miller and Dodds spoke on the phone an average of at least three times per day, exchanged over 500 emails, and exchanged hundreds of text messages regarding production, sales, and payment for pre-cast concrete fencing. (*Id.* at ¶ 17.)  Since 2013, Liberty Holdings has not had any Tennessee customers. Liberty Holdings is no longer operating. (Miller Decl. at ¶ 7.)

From about January 2012 to the present, Weis has served as a manager of RSTM, a Delaware limited liability company.[10] (Weiss Decl. at ¶ 7.) RSTM is the general partner of Liberty

---

[10]  In 2019, Weiss caused to be filed with the Delaware Secretary of State a certificate of cancellation of RSTM as a Delaware limited liability company in connection with the winding

Holdings; RSTM's primary asset, at all times, has been its partnership interest in Liberty Holdings. (*Id.* at ¶ 8.)

From about January 2012 to the present, Weiss also served as an officer of Liberty Holdings, including the roles of CFO and President, and was an authorized signatory on Liberty Holdings' California bank accounts. His responsibilities as an officer of Liberty Holdings included managing Liberty Holdings' financing sources, bookkeeping, preparing financial statements, analysis of work in process, analysis of accounts receivable but not collection, and analysis of cash flows, but he did not regularly have direct interaction with Liberty Holding's customers or vendors. (*Id.* at ¶ 9.)

Weiss is also an authorized agent of J & S Investments. J & S is a California general partnership. Its current general partners, as of approximately 2017, are Boulder Investment Group, LP, and JVJ Holdings LP, a California limited partnership.  Boulder Investment Group, LP, in turn, is a California limited partnership, whose general partner is Weiss Alternative Ventures, LLC, a Delaware limited liability company. Since its formation in approximately 2008, Weiss has served as a manger of Weiss Alternative Ventures, LLC.  (*Id.* at ¶ 10.)

RSTM and J & S are headquartered in California, and they were formed to hold and manage various private investments. RSTM and J & S have no Tennessee offices, no Tennessee bank accounts, and no Tennessee employees. Neither RSTM nor J & S has any Tennessee customers. Neither RSTM nor J & S holds any Tennessee state or local licenses. RSTM and J & S do not file any state or local tax returns in Tennessee, nor are RSTM or J & S required, based on their business

---

up of its affairs. However, he has obtained a voluntary revocation of that cancellation to permit RSTM to continue its defense of the claims herein.  (ECF No. 66.)

operations or investment holdings, to pay any state or local taxes to a Tennessee authority. (*Id.* at ¶ 11.)

In January 2016, Liberty Holdings became delinquent on past due amounts owed to Southern Concrete, its largest creditor, in excess of six figures, and never brought its account current prior to the termination of the relationship. (Dodds Decl. at ¶ 18). Around the same time in early 2016, Miller began contacting Dodds to request that Miller be permitted to remove Liberty Holdings' pre-cast concrete molds from Southern Concrete's Tennessee concrete plant and relocate them to Texas for "maintenance," indicating that Miller would return them once the maintenance was complete. (*Id.* at ¶ 19.)

On February 9, 2016, Miller emailed Dodds and promised to pay $54,723.50 by March 4, 2016, and then an additional $25,084.00 by March 16, 2016. Southern Concrete never received these payments. (*Id.* at ¶ 20). Southern Concrete emailed Miller on February 29, 2016, to confirm the scheduling of these payments and to inquire about payment on other past due invoices dating back to May 2015. (*Id.* at ¶ 21).

J & S made a series of loans to Liberty Holdings from about January 2015 to March 2018 to help fund Liberty Holdings' operations. In 2016, Liberty Holdings granted a security interest to J & S against all of Liberty Holdings' personal property assets, which included but was not limited to Liberty Holdings' accounts, contract rights, deposit accounts, documents, equipment, general intangibles, and goods, such as the molds in Southern Concrete's possession. Liberty Holdings granted the security interest to J & S pursuant to a Loan and Security Agreement, dated as of March 23, 2016 (the "2016 Loan and Security Agreement"). (Weiss Decl. at ¶ 15; Exb. 1, ECF No. 64-4.)

In connection with the Loan and Security Agreement, Liberty Holdings also executed a Secured Promissory Note on March 23, 2016, memorializing its obligation for $685,000.00 in loans made by J & S to Liberty Holdings ("2016 Note"). (*Id.* at ¶ 16; Exb. 2, ECF No. 64-5.) Because Liberty Holdings was organized in California, J & S perfected its security interest in the personal property of Liberty Holdings by, among other things, filing with the California Secretary of State, a UCC-1 financing statement on February 6, 2018, as Filing No. 18-7632192049. (*Id.* at ¶ 17; Exb. 3, ECF No. 64-6.)

Despite Liberty Holdings' indebtedness to Southern Concrete, Weiss made representations to J & S Investments (which was owned and controlled by Weiss) in the March 23, 2016 Security Agreement regarding Liberty Holdings' operations and financial conditions.  Specifically, Weiss represented the following:

(i)     There are no actions, suits, legal, equitable, arbitration, or administrative proceedings, pending or, to the knowledge of Borrower, threatened against any Borrower which could reasonably be expected to result in a Material Adverse Change[11]

(j)     Borrower is not in default in any respect under any contract, lease, loan, agreement, indenture, mortgage, security agreement or other agreement or obligation to which it is a party or by which any of its properties is bound which default could reasonably be expected to result in a Material Adverse Change."

(Weiss Decl. Exb. 1, ECF No. 64-4.)**.**

Miller continued to contact Dodds to request that Liberty Holdings be permitted to remove the molds and relocate them to Texas for maintenance. In response to Miller's request to remove the pre-cast concrete fencing molds for maintenance, Dodds initially advised Miller that Southern

---

[11]  "Material Adverse Change" means (A) a material adverse change in the business, prospects, operations, results of operations, assets, liabilities or condition (financial or otherwise) of Borrower . . . (Weiss Decl. Exb. 1, ECF No. 64-4.)

Concrete could not release them because it had orders to produce. After Miller continued to persistently request that he be permitted to remove the molds for maintenance, Dodds told him that Southern Concrete would not release Liberty Holdings' molds from its premises because Southern Concrete was asserting a molder's lien pursuant to Tenn. Code Ann. §§ 66-18-102 *et seq.* for the unpaid balance owed; Dodds also told Miller that Southern Concrete would continue to manufacture pre-cast concrete fencing if Liberty Holdings made efforts to get its past due balance current. (Dodds Decl. at ¶¶ 18, 20).  On August 31, 2016, Southern Concrete agreed to permit Miller to remove some, but not all, of the molds from Southern Concrete's plant in Jackson, Tennessee, for maintenance specific to two certain styles of fencing known as "Chiselcrete" and "Brickcrete." These molds were shipped by truck to Liberty Holdings' location in Texas. Liberty Holdings never returned those molds to Southern Concrete and, instead, began producing pre-cast concrete fencing in Texas using the Chiselcrete and Brickcrete molds that Southern Concrete shipped to Liberty Holdings. (Dodds Decl. at ¶¶ 18, 20).

From March 2016 to March 2018, J & S made additional advances to Liberty Holdings to fund its Texas operations. (Weiss Decl. at ¶ 18.)  Although Southern Concrete was the exclusive supplier of the only product that Liberty Holdings sold and the sole possessor of the molds to make Liberty Holdings' product, Liberty Holdings did not use the proceeds of the purported loan(s) from J & S to Liberty Holdings to pay Southern Concrete. (Dodds Decl. at ¶¶ 18, 20).

By March 2018, Liberty Holdings' debt to J & S was approximately $1,185,000.00. In March 2018, Liberty Holdings executed an Amended Loan and Security Agreement and an Amended Secured Promissory Note, memorializing Liberty Holdings' liability for the principal amount of $1,185,000.00 due from Liberty Holdings to J & S. (Weiss Decl. at ¶ 19.)   By 2018,

Liberty Holdings had defaulted under its obligations to J & S and to many of its other creditors. (*Id.* at ¶ 21.)

On or about March 5, 2018, Weiss, as president of Liberty Holdings, sent a letter to all of the known trade creditors of Liberty Holdings, including Southern Concrete, notifying them of Liberty Holdings' financial situation and inviting a settlement of the unsecured trade debts due from Liberty Holdings to those creditors. (*Id.* at ¶ 22.) The letter notified Southern Concrete that Liberty Holdings was in a "current and dire financial condition" and that Liberty Holdings had transferred its production of concrete barriers and fencing away from Southern Concrete and "transition[ed] this work to in-house crews to reduce costs."

After sending letters on March 5, 2018, and March 20, 2018, indicating that Liberty Holdings was insolvent and would file bankruptcy if Southern Concrete did not accept pennies on the dollar of what was owed to it, Weiss entered into an Amended Loan and Security Agreement and Amended Note on behalf of Liberty Holdings with J & S Investments to purportedly grant J & S a security interest in all of Liberty Holdings' assets up to $1,185,000.004, presumably based on additional purported loans made by J & S to Liberty Holdings**.** (Weiss Decl. Exb. 4 & 5, ECF Nos. 64-7, 64-8.) Liberty Holdings did not use the proceeds of any of the purported loans totaling $1,185,000.00 from J & S Investments to pay its debt to Southern Concrete or any of its other creditors. (Dodds Decl. at ¶¶ 18, 20).

Immediately following the execution of Amended Secured Promissory Note and Amended Security Agreement, J & S initiated a foreclosure sale of the personal property assets securing Liberty Holdings' obligations to J & S under the Financing Agreement; the buyer in the private foreclosure sale was Defendant Hilltop Concrete, a Delaware limited liability company. (Weiss Decl. at ¶ 23). Weiss was an owner (directly or indirectly) and the person with legal control of all

of the entity/corporate co-defendants; Weiss acted on behalf of J & S Investments, Liberty Holdings, RSTM Pacific, and Hilltop Concrete, with respect to all of the transactions set forth above. (*Id.* at ¶¶ 7-11, 24). The sale was conducted as a private sale of the collateral under Section 9610 of the Uniform Commercial Code, as adopted by the State of California. (*Id.* at ¶ 23.)

Hilltop was formed in March 2018. Hilltop's members are currently (i) Boulder Investment Group, LP and (ii) J & S. Neither Hilltop nor its members have assets, operations, or business in the state of Tennessee. (*Id.* at ¶ 24.)   Hilltop operates in Texas, with Weiss serving as its CFO. His duties include preparation of financial statements, preparation of tax returns, and schedules related to the returns. He is responsible for the day-to-day operations of Hilltop.  (*Id.* at ¶ 25.)

Since about March 2018 and through the present, Miller has been an employee and officer of Hilltop and manages Hilltop's operations. He does not own any membership interest in Hilltop. (Miller Decl. at ¶ 11.)  Hilltop is also in the business of supplying concrete barrier walls to its customers. However, Hilltop does not contract with Southern Concrete for concrete products. Hilltop has no Tennessee customers, offices, or employees. Hilltop operates from Flint, Texas, on the outskirts of Tyler, Texas. Hilltop does not knowingly purchase products from any Tennessee vendors, and it has not bid for any Tennessee construction projects. Hilltop holds no Tennessee state or local licenses. Hilltop does not pay taxes to any Tennessee state or local taxing authority. (*Id.* at ¶ 12.)

<u>Analysis</u>

As noted previously, this Court has general jurisdiction over the now defunct Liberty Holdings but not over the remaining defendants. The question presented in Defendants' second motion to dismiss is whether the Court has specific jurisdiction over the movant defendants.  The

Court finds that it does have specific jurisdiction over Defendant Christopher Miller but does not have specific jurisdiction over the other defendants.

<u>Christopher Miller</u>

Plaintiff contends that the forum selection clause and personal guarantee signed by Miller, as well as his other activities, give the Court specific jurisdiction over Miller, while Defendants argue that the clause and guarantee are binding as to Liberty Holdings only. The Court agrees with Plaintiff's contention and finds that the assertion of personal jurisdiction over Miller does not "violate constitutional due process." *Aristech Chem. Int'l*, 138 F.3d at 627.

There is no dispute that Miller, as a representative of Liberty Holdings, signed a credit application agreeing to personal jurisdiction and venue in Madison County, Tennessee, for actions arising out of any dispute for non-payment for goods and materials sold by Southern Concrete to Liberty Holdings. The credit application states that "The undersigned agrees to jurisdiction and venue being in the courts of Madison County, Tennessee," followed by Miller's signature twice as the "undersigned" – once in his capacity as a representative of Liberty Holdings and once in his individual capacity as a personal guarantor. This agreement is clearly binding as to Liberty Holdings, and, when combined with Miller's personal guarantee and his other activities, is binding on Miller.

As noted by Plaintiff, "the enforceability of [] forum selection clause[s] is governed by federal law," and, under federal law, "a forum selection clause should be upheld absent a strong showing that it should be set aside" and the party challenging the clause has the burden to demonstrate that it should not be enforced. *Wong v. PartyGaming, Ltd.*, 589 F.3d 821, 828 (6th Cir. 2009). In making this "strong showing," the party opposing the forum selection clause has the burden of demonstrating that (1) the clause was "obtained by fraud, duress, or other

unconscionable means," (2) the "designated forum would ineffectively or unfairly handle the suit," or (3) the designated forum "would be so seriously inconvenient such that requiring the [defendant to defend a] suit there would be unjust." *Id.* In the present case, Defendants do not claim that the application containing the forum selection clause was procured by fraud, duress, or unconscionable means, nor have they asserted that this Court would ineffectively or unfairly handle this case. Defendants similarly fail to advance a "strong showing" that it would be "so seriously inconvenient to defend a suit in the Western District that such a suit would be unjust" (as opposed to being merely "inconvenient").

Moreover, Defendant Miller had "certain minimum contacts" with Tennessee "such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *International Shoe Co.*, 326 U.S. at 316. First, Miller "purposefully avail[ed] himself of the privilege of acting in the forum state or causing a consequence in the forum state." *Southern Mach. Co.*, 401 F.2d at 381. He regularly communicated with Dodds, and, in fact, Miller was Dodds' primary contact in Southern Concrete's business dealings with Artisan Precast and later Liberty Holdings. Moreover, Miller came to Tennessee more than once as part of those business dealings.

All of Miller's contacts with Southern Concrete and Dodds that occurred outside of Tennessee were taken for the purpose of "causing a consequence" in Tennessee and were not "random," "fortuitous," or "attenuated," *Burger King*, 471 U.S. at 475; instead, Miller "deliberately engaged in efforts within the state." *Id.* at 476. For example, Miller emailed Southern Concrete promising that Liberty Holdings would make specified payments on Liberty Holdings' delinquent account and then allegedly assisted in transferring the assets of Liberty Holdings to

other entities while failing to pay Southern Concrete.[12]  Miller even enticed Dodds to return some of the molds to Texas on the alleged pretext of "maintenance."

Moreover, Miller showed by signing the choice of forum clause and the personal guarantee that he understood that any disputes between Southern Concrete and Liberty Holdings would be litigated in Tennessee, and he should have contemplated being part of that litigation. Clearly, Miller had "fair warning" that he could be "haled into" court in Tennessee.  *Id.* at 472-74. Therefore, Southern Concrete has met this factor by the preponderance of the evidence.

Next, Plaintiff's cause of action arises from Miller's activities in Tennessee.  *Id.* The only evidence of Miller's activities in Tennessee relate to the business dealings of Southern Concrete and Artisan Precast and Liberty Holdings. The "arising from" requirement is satisfied when the operative facts of the controversy arise from the defendant's contacts with the state, as in the present case.  *Southern Mach. Co.*, 401 F.2d at 384.  "Only when the operative facts of the controversy are not related to the defendant's contact with the state can it be said that the cause of action does not arise from that contract."  *Id.*

Finally, Miller's acts or consequences caused by those acts had "a substantial enough connection with the forum state to make the exercise of jurisdiction over the defendant reasonable." *Id.*  As to the third prong, "when the first two elements are met, an inference arises that the third, fairness, is also present; only the unusual case will not meet this third criterion." *First Nat'l Bank of Louisville v. J.W. Brewer Tire Co.*, 680 F.2d 1123, 1126 (6th Cir.1982).  This is not the kind of "unusual case" that does not meet the third prong. All of Miller's acts and the consequences of those acts led to the circumstances giving rise to this lawsuit.

---

[12]  While these activities alone do not support a finding of specific personal jurisdiction, see the discussion below concerning Defendant Weiss, they do support such a finding when combined with Defendant Miller's other activities directed toward Tennessee and his agreement to the forum selection clause in the credit application along with his personal guarantee.

Accordingly, the Court finds that it has personal jurisdiction over Christopher Miller, and the motion to dismiss as to Miller is denied.

<u>Other Defendants</u>

The issue is not whether Plaintiff has stated a claim against the remaining defendants but, instead, whether Plaintiff can sue them in Tennessee. Despite the numerous allegations against the movant entity/corporate defendants J & S Investments, RSTM Pacific, LLC, and Hilltop Concrete, LLC, Plaintiff has pointed to no evidence showing that these Defendants' in-state activities gave rise to Plaintiff's claim. *See Int'l Shoe*, 326 U.S. at 317–18. In fact, these Defendants had no activities in Tennessee. There is no evidence in the record that these entities are incorporated in Tennessee, have done business in Tennessee, have maintained any other presence in Tennessee, or have directed their activities toward Tennessee. Defendants RSTM and J & S are both domiciled in California, and their connection with this matter is limited to RSTM's partnership interest in Liberty Holdings and J & S's blanket lien against Liberty Holdings' personal property assets. In order for a nonresident defendant's contacts with the forum state to be sufficient to give rise to personal jurisdiction in that forum, those contacts must arise out of the defendant's own purposeful, deliberate actions directed toward the forum state, *Burger King Corp.*, 471 U.S. at 473, and there is no evidence of such.

Instead, the evidence shows that all activities of the entity/corporate defendants were financial transactions occurring out of state. Although those transaction may ultimately impact Plaintiff's ability to recover any damages that it might be awarded, "mere injury to a forum resident is not a sufficient connection to the forum." *Walden v. Fiore*, 571 U.S. 277, 290 (2014). When a defendant's actions allegedly giving rise to the litigation all occurred outside the forum state, as in the present case, a court generally cannot find it has specific jurisdiction over the out-of-state

defendant.  The connection between the defendant's activity and the forum state is obligatory. "When there is no such connection, specific jurisdiction is lacking regardless of the extent of a defendant's unconnected activities in the State." *Bristol-Myers Squibb Co. v. Superior Ct. of California, San Francisco Cty.*, 137 S. Ct. 1773, 1781 (2017).  The Court agrees with Defendants that the existence of California loans to a Texas-based business is not a forum contact that will support a finding of personal jurisdiction over the movant entity/corporate defendants.

Likewise, with Scott Weiss, even though he was an officer of Liberty Holdings, the record does not contain evidence of his activities or presence in Tennessee.  As discussed above, the financial transactions of the entity/corporate defendants, by themselves, do not establish personal jurisdiction over those defendants. For those same reasons, the part that Weiss played in those financial transactions does not establish personal jurisdiction over him.

As for Weiss' other activities, the record shows that he performed bookkeeping functions for Liberty Holdings, he was an authorized signer on Liberty Holdings' California checking account, and, in 2018, he issued a letter on behalf of Liberty Holdings to various vendors of Liberty Holdings, including Southern Concrete, in an attempt to resolve the amounts due to those vendors. None of these contacts impacted Southern Concrete particularly or this forum directly. *See Blessing v. Chandrasekhar*, 988 F.3d 889, 905 (6th Cir. 2021) (noting that the Court of Appeals has "held that personal jurisdiction is absent when the communication was not specifically directed at the forum state").

Although Plaintiff argues otherwise, the Court cannot find that the credit application's forum selection clause is binding on the entity/corporate non-signatories or on Weiss. As pointed out by Defendants, RSTM, Weiss, Hilltop, and J & S were not mentioned in connection with the credit application, and Defendant Hilltop was not formed until four years after the signing of the

credit application. The record does not show that RSTM, Weiss, Hilltop, or J & S ever requested materials from Southern Concrete pursuant to the credit application, and Hilltop, Liberty Holdings' successor, never purchased concrete fencing from Southern Concrete under the credit application. "[T]o bind a non-party to a forum selection clause, the party must be 'closely related' to the dispute such that it becomes 'forseeable' that it will be bound . . ." *Baker v. LeBoeuf, Lamb, Leiby & Macrae*, 105 F.3d 1102, 1106 (6th Cir. 1997).  Plaintiff has made no such showing in this case and has not met its burden to show that this Court has personal jurisdiction over Weiss or over the movant entity/corporate defendants.

<u>Summary and Conclusion</u>

Defendants' renewed Fed. R. Civ. P. 12(b)(2) motion to dismiss for lack of personal jurisdiction (ECF No. 64) is **PARTIALLY GRANTED** and **PARTIALLY DENIED**.  The Court finds that it does not have personal jurisdiction over Defendants J & S Investments, RSTM Pacific, LLC, Hilltop Concrete, LLC, and Scott Weiss, and they are dismissed from the action. However, the Court does have personal jurisdiction over Defendant Christopher Miller (as well as Liberty Holdings, which is not a party to the motion), and the motion to dismiss is denied as to Defendant Miller.

IT IS SO ORDERED.

**s/ S. Thomas Anderson**
S. THOMAS ANDERSON
CHIEF UNITED STATES DISTRICT JUDGE

Date:   November 2, 2021.